# EXHIBIT B

**IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYL** ~~...~~

*Filed and Attested by
PROTHONOTARY
02 Mar 2026 04:59 PM
A. Avella*

| | |
|---|---|
| CARMEN RUDNICK, *individually and on behalf of all others similarly situated*, | CIVIL DIVISION – CLASS A ~~...~~ |
| | No. 2026-00902-TT |
| Plaintiff, | |
| | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| DOLCE & GABBANA S.R.L., | |
| | Filed on behalf of Plaintiff Carmen Rudnick |
| Defendant. | |
| | Counsel of Record for this Party: |

Nicholas A. Colella
(Pa. ID No. 332699)
**LYNCH CARPENTER LLP**
1133 Penn Ave., 5th Floor
Pittsburgh PA, 15222
P: 412.322.9243
NickC@lcllp.com

**IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYLVANIA**

| | |
|---|---|
| CARMEN RUDNICK, *individually and on behalf of all others similarly situated*, | CIVIL DIVISION – CLASS ACTION |
| Plaintiff, | No. 2026-00902-TT |
| v. | |
| DOLCE & GABBANA S.R.L., | |
| Defendant. | |

## <u>NOTICE TO DEFEND</u>

**YOU HAVE BEEN SUED IN COURT.** If you wish to defend against the claims set forth in the following pages, you must take action within **SIXTY (60)** days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you. **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.**

**IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Lawyer Referral and Information Service
Chester County Bar Association
15 West Gay Street
West Chester, PA 19380
(610) 429-1500

*2026-00902-TT*

**IN THE COURT OF COMMON PLEAS OF CHESTER COUNTY, PENNSYLVANIA**

| | |
|---|---|
| CARMEN RUDNICK, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>DOLCE & GABBANA S.R.L.,<br><br>Defendant. | No. 2026-00902-TT<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carmen Rudnick ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Dolce & Gabbana S.r.l. ("Dolce & Gabbana" or "Defendant"), and in support thereof alleges the following:

## I.    NATURE OF THE ACTION

1.    This is a class action brought against Defendant for the wiretapping of electronic communications of visitors to Defendant's Website, https://www.dolcegabbana.com ("Website"), and all of the Website's subpages.

2.    Defendant procures Powerfront, a third-party vendor, to embed snippets of JavaScript computer code (the "Code") on the Website, which then deploys on each Website visitor's internet browser for the purpose of intercepting and recording the Website visitor's electronic communications with the Website. The Code intercepts Website visitors' page views, URLs of web pages visited, browser information, IP address, demographic information of the website visitor, form submissions entered into text fields, and/or other electronic communications in real-time (collectively, "Website Communications").

3.    The Code procured by Defendant surreptitiously and instantaneously intercepted, stored, and recorded everything Plaintiff and the Class Members did on the Website, *e.g.*, what

1

they searched for, what they looked at, the information they input, and what they clicked on for the entire duration of their visit. The Code does this on a continuous basis during a website visitor's visit.

4. Powerfront creates and deploys the Code at Defendant's request, and the Code captures and stores the Website Communications of each Website visitor.

5. Defendant offers the ability for Website visitors to configure their privacy preferences, purportedly preventing third parties from capturing Website Communications. However, even after a Website user rejects the use of the Code to track Website Communications, Defendant still allows Powerfront to capture all Website visitor's Website Communications without their consent.

6. Defendant knowingly, willfully, and intentionally procured the interception of, and used, the electronic communications at issue without the knowledge or prior consent (or, in some cases, against their direct rejection of consent) of Plaintiff or the Class Members. Defendant did so for its own financial gain and in violation of Plaintiff's and the Class Members' substantive legal privacy rights under state wiretapping laws and common law.

7. Plaintiff brings this action individually and on behalf of a class of all Pennsylvania citizens whose Website Communications were intercepted through the use of the Code embedded on Defendant's Website. Plaintiff seeks all civil remedies provided under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

## II.    PARTIES

8. Plaintiff Carmen Rudnick is, and was at all relevant times, a resident and citizen of Chester County in the Commonwealth of Pennsylvania.

2

9.      Defendant Dolce & Gabbana S.r.l., is a company formed under the laws of Italy with a registered office at 10 – 20129 Via Carlo Goldoni, Milan, Italy.

10.      Defendant owns, manages, and operates the Website at www.dolcegabbana.com, including its subpages.

### III.      JURISDICTION AND VENUE

11.      This court has personal jurisdiction over Defendant because Defendant targets its interactive Website at residents in Pennsylvania, generates substantial revenue from its sales in Pennsylvania through its use of the Website, and Plaintiff's and Class Members' claims arise directly from business transactions that Defendant conducts on its Website within Pennsylvania. Indeed, Defendant's website allows customers to search and purchase products, and have them delivered to their homes within the United States, including Pennsylvania

12.      Specifically, Defendant automatically tailors the Website to seamlessly do business in the United States by translating the Website to English, and defaulting the currency to U.S. Dollars when users access the Website from Pennsylvania:

## COUNTRY & LANGUAGE

Be advised that changing your location while shopping will remove all the contents from your shopping bag.

| COUNTRY / CURRENCY | LANGUAGE |
|---|---|
| USA / $ ⌄ | English ⌄ |

13.      Further, Defendant maintains a customer service contact line via a "+1" country code on its Website, demarcating the United States, with available customer service hours in Eastern Standard Time:

3

*2026-00902-TT*



14.     Defendant's Website also operates for the purpose of allowing Website visitors to locate stores within the United States, and within the Commonwealth of Pennsylvania:

FIND A BOUTIQUE

Search by city and state or ZIP code

PHILADELPHIA, PENNSYLVANIA, UNITED STATES     Search  ⬙

1 locations near Philadelphia, Pennsylvania, United States
Discover all the Boutiques

Filters

Customize your search and find the Boutique that best suits your needs

Fashion     Sartoria - Made to Measure     Beauty     Home     Bar

Food&Beverage     Personalization service

Dolce & Gabbana Pennsylvania King Of Prussia

• Open now - Closes at 7:00 PM

c/o King of Prussia
160 N Gulph Road
Pennsylvania, PA 19406
+1 610 477 3037

More details   BOOK AN APPOINTMENT

15.     Upon information and belief, Defendant contracted with a U.S. corporation (Powerfront, Inc.—headquartered in Los Angeles, California) to conduct the alleged unlawful

4

conduct as described herein within the bounds of the Commonwealth of Pennsylvania, impacting Pennsylvania citizens.

16.    Venue is appropriate in this Court under Pa. R.C.P. 1006 because the cause of action arose in this County, and the transaction or occurrence took place out of which the cause of action arose in this County.

## IV.    FACTUAL ALLEGATIONS

### A.    How the Code Intercepts Website Communications

17.    Powerfront describes itself as a "world-class SaaS [*i.e.*, Software as a Service] company built to enrich the conversations between brands and online customers."[1]

18.    One of Powerfront's core products is INSIDE, which Powerfront describes as "[t]he ultimate AI Chatbot & video solution [that] enables brands to visually see their online customers in real-time."[2]

19.    Powerfront promises that its software is "the SaaS solution for 'customer-obsessed' brands wanting to engage & connect as much as possible with their online customers across digital platforms," *i.e.*, by promoting content on online locations such as social media networks.[3]

20.    To enable features of the INSIDE product, Powerfront instructs website operators like Defendant to install a JavaScript snippet ("INSIDE Code") to their e-commerce websites.

21.    The INSIDE Code collects large swaths of information relating to a website users' IP addresses, unique ID numbers, webpages visited, buttons clicked, keystrokes typed, products searched for, and more.

---

[1] *About Us*, https://www.powerfront.com/about-us-know-more-about-powerfront/ (last visited January 29, 2026).
[2] *Home*, https://www.powerfront.com/ (last visited January 26, 2026).
[3] *About Us*, *supra* n. 1.

*2026-00902-TT*

22.    The INSIDE Code receives the information about a website user's actions contemporaneously with those actions. This means that as soon as a website loads, the already installed Code fires, and any action a website user takes is sent to Powerfront.

23.    Once the INSIDE Code intercepts this data, it is sent to Powerfront's servers, where it is stored and processed. The data collected by Powerfront is then used to match website actions to individuals, as well as provide attribution reports and track users.

24.    Defendant has installed the INSIDE Code on the Website:



*Screenshot taken after "Continue without Accepting" was selected*

25.    Through this technology, Powerfront intercepted Defendant's Website users' communications. As a result, information Plaintiff intended to provide to Defendant was intercepted by Powerfront. For example, when a Website user searches a sequin dress, that information is captured instantaneously by Powerfront:

*2026-00902-TT*



*Screenshot taken after "Continue without Accepting" was selected*

26.    Plaintiff did not consent to the interception of her data by Powerfront. To the contrary, as alleged below, Plaintiff rejected all cookies when Defendant presented her with the option. Powerfront's nonconsensual interception of Plaintiff's data resulted from Defendant's conduct, constitutes an invasion of privacy, breach of contract, and violates Pennsylvania law.

**B.    <u>Website Users Have a Reasonable Expectation of Privacy in their Interactions with Defendant's Website</u>**

27.    Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."

28.    Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website hosts and not be shared with a third-party they know nothing about. As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.

*2026-00902-TT*

29.    Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

30.    A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.

31.    Moreover, according to a study by Pew Research Center, a significant majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.

32.    Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.

33.    Defendant's Website purports to provide users with the opportunity to decline the third-party tracking described above. When a Website visitor visits the Website, Defendant displays a pop-up box telling users that the site uses cookies—except for technical cookies—"only once we have received your consent."

*2026-00902-TT*



*Defendant's pop-up window promising Website visitors that it will not use non-technical cookies without users' consent.*

34.     Defendant thus promises Website users that cookies used to "personalize content and ads, to provide social media features and to analyse [sic] our traffic" are ***not used without a users' express consent.***

35.     Defendant further assures users that if they click "Continue without Accepting," they can continue to browse the Website without installing the cookies that run for any of the purposes described in the paragraph above.

36.     Reasonable Website users thus understand that, unless and until they click to "Accept All" cookies in Defendant's pop-up window, cookies that (i) personalize content and ads, (ii) provide social media features, (iii) analyze Website traffic, or (iv) provide any other non-technical function do not and will not operate on the Website.

37.     Website users who refuse to "Accept All" cookies are telling Defendant, unequivocally, that they ***do not consent*** to their Website Communications being sold to third

9

parties. These users have a clear and objectively reasonable expectation that their data will not be collected, disclosed, used, or analyzed in any way—let alone by unknown third parties.

38.    However, Defendant does not honor their Website users' preferences. Instead, Defendant enabled Powerfront to collect, use, and analyze Website Communications even when users do not indicate their consent, or expressly deny consent, to such tracking.

39.    The Powerfront code works the same for all Website visitors who chose to continue without accepting cookies.

### C.    Website User and Usage Data Have Immense Economic Value

40.    The "world's most valuable resource is no longer oil, but data."[4]

41.    In 2022, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[5] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[6]

42.    In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success.

---

[4] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[5] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[6] *Id*.

10

*2026-00902-TT*

Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[7]

43.    In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[8] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[9]

44.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.,* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55."[10]

**D.    Plaintiff's and Class Members' Experiences**

45.    While in Pennsylvania, Plaintiff visited www.dolcegabbana.com and certain of its subpages. Plaintiff chose to continue without accepting cookies on Defendant's pop-up menu.

46.    After choosing to continue without accepting cookies, Plaintiff browsed for different products on the Website and communicated with the Website by using her mouse to hover and click on certain products and typing content into form fields, including product names into the search bar.

---

[7] Brad Brown, *et al*, *Capturing value from your customer data*, McKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[8] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGIT. ECON. PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf.

[9] *Id.* at 25.

[10] *Id.*

*2026-00902-TT*

47. Following Plaintiff's visit to the Website, she began receiving advertisements for Dolce & Gabbana on her Facebook and TikTok accounts, highlighting items similar to the items Plaintiff browsed on the Website.

48. Upon information and belief, these advertisements were a result of the Powerfront capturing her information during her Website visit without her consent.

49. The wiretapping by the Code is, and was, ongoing during her visit and intercepts the contents of these communications between Plaintiff and Defendant with instantaneous and continuous transmissions to Powerfront.

50. Thus, when Plaintiff visited Defendant's Website, the contents of her communications with the Website were intercepted by the Code, and simultaneously transmitted to Powerfront, without her consent.

51. The tracking Code described above operates in the same manner for all putative Class Members.

52. Like Plaintiff, each Class Member visited Defendant's Website with the Code embedded in it, rejected cookies when presented with the option, and the Code intercepted the Class Members' Website Communications with the Website by sending hyper-frequent logs of those communications to Powerfront.

53. The Code procured by Defendant is an electronic, mechanical, or other analogous device in that the Code, monitors, collects, and records the content of electronic computer-to-computer communications between Plaintiff's computer and/or mobile device and the computer servers and hardware utilized by Defendant to operate its Website, subsequently interpreting that data to repurpose it for profits.

*2026-00902-TT*

54. Alternatively, even if the Code itself were not a device, the Code is a software designed to alter the operation of a Website visitor's computer or mobile phone by instructing the hardware components of that physical device to run the processes that ultimately intercept the visitor's communications and transmit them to Powerfront, without the visitor's knowledge.

55. The data collected by the Code identified specific information input and content viewed, and thus revealed personal and sensitive information about website visitors' internet activity and habits. As such, by the very nature of its operation, the Code is a device used to intercept electronic communications.

56. The Website Communications that Defendant solicited Powerfront to monitor, collect, and record was content generated through Plaintiff's and Class Members' use, interaction, and communication with Defendant's Website relating to the substance and/or meaning of Plaintiff's and Class Members' communications with the Website, *i.e.*, information inputted by Plaintiff and Class Members, and pages and content clicked on and viewed by Plaintiff and Class Members. This information is "content" and is not merely record information regarding the characteristics of the message that is generated in the course of the communication, nor is it simply information disclosed in the referrer headers. The mere fact that Defendant values this content, and procures third parties to monitor, intercept and record it, confirms these communications are content that convey substance and meaning to Defendant, and, in turn, to Powerfront, who receives the intercepted information.

57. Plaintiff reasonably expected that her visit to Defendant's Website would be private and that Defendant would not have procured multiple third-party vendors to track, record, and/or watch Plaintiff as she browsed, interacted with the Website, and searched for products or services, especially given that she expressly rejected the tracking of this information.

13

**E.** **Plaintiff and Class Members Did Not Consent to the Interception of their Electronic Communications**

58.     Plaintiff and Class Members did not provide prior consent to Defendant's interception of their Website Communications, nor could they, as the interception begins immediately upon arriving at Defendant's Website.

59.     Even worse, Defendant asked Plaintiff and Class Members for consent, but had no intention of disallowing the Code from running when Website visitors chose to continue browsing the Website without allowing non-technical cookies.

60.     When Plaintiff and Class Members chose to continue browsing the Website without allowing non-technical cookies, Defendant still allowed Powerfront to deploy the Code and capture Website Communications.

## V.     CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated.

62.     Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All Pennsylvania citizens who visited www.dolcegabbana.com and rejected cookies while the Code was embedded on www.dolcegabbana.com.

63.     Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

64.     Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery. The proposed

14

Class meets the criteria for certification under Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure.

65. **Numerosity – Rule 1702(1)**: The members of the Class are so numerous that individual joinder of all Class Members is impracticable. The precise number of Class Members and their identities may be obtained from the books and records of Defendant and/or Powerfront.

66. **Commonality – Rule 1702(2)**: This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a. whether Defendant procures Powerfront and other third parties to intercept Defendant's Website visitors' Website Communications;

b. whether Defendant intentionally discloses the intercepted Website Communications of its Website users;

c. whether Defendant acquires the contents of Website users' Website Communications without their consent;

d. whether Defendant's conduct violates Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. § 5701, *et seq.*;

e. whether Defendant's conduct constitutes a breach of contract;

f. whether Plaintiff and Class Members are entitled to equitable relief; and

g. whether Plaintiff and the Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

67. **Typicality – Rule 1702(3)**: Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy.

*2026-00902-TT*

This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

68.    **Adequacy of Representation – Rule 1702(4) & 1709**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigation to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class. Furthermore, Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.

69.    **Predominance – Rule 1708(a)(1)**. Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant intercepted Plaintiff's and Class Members' Website Communications, then Plaintiff and each Class Member suffered damages by that conduct.

70.    **Manageability – Rule 1708 (a)(2):** The precise size of the Class is unknown without the disclosure of Defendant's records. The claims of Plaintiff and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Class.

16

71. **Risk of Inconsistent, Varying or Prejudicial Adjudications – Rule 1708(a)(3):** If the claims of Plaintiff and the members of the Class were tried separately, Defendant may be confronted with incompatible standards of conduct and divergent court decisions. Furthermore, if the claims of Plaintiff and the members of the Class were tried individually, adjudications with respect to individual Class members and their propriety of their claims could be dispositive on the interests of other members of the Class not party to those individual adjudications and substantially, if not fully, impair or impede their ability to protect their interests.

72. **Litigation Already Commenced – Rule 1708(a)(4)**: To Plaintiff's knowledge, there is no other pending case where Defendant's customers seek to represent a class of individuals impacted based on the conduct alleged in this Complaint.

73. **The Class Members' Claims Support Certification – Rules 1708(a)(6) and (7):** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits. Furthermore, the damages that may be recovered by the Class will not be so small that class certification is unjustified.

## VI.   CAUSES OF ACTION

### COUNT I
**Violation of Pennsylvania Wiretap Act**
**18 Pa. Cons. Stat. § 5701, et seq.**

74. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

75. Plaintiff brings this claim individually and on behalf of the Class.

76. The Pennsylvania Wiretap Act (the "Act") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral

*2026-00902-TT*

communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

77.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

78.     "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

79.     "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

80.     "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

81.     "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

82.     Defendant is a person for purposes of the Act because it is a corporation.

83.     The Code procured by Defendant is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

18

84.     Plaintiff's and Class Members' intercepted Website Communications constitute the "contents" of electronic communication[s]" within the meaning of the Act.

85.     Defendant intentionally procures and embeds the Code on its Website to spy on, automatically and secretly, and intercepts its Website visitors' electronic interactions communications with Defendant in real time.

86.     Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

87.     Plaintiff and Class Members did not consent to having their Website Communications wiretapped.

88.     Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and the Class Members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

89.     Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendant's Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
### Invasion of Privacy – Intrusion Upon Seclusion

90.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

91.     Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

92.     Plaintiff brings this claim individually and on behalf of the Class.

19

*2026-00902-TT*

93. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications.

94. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendant could collect or disclose their Website Communications.

95. Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

96. Defendant intentionally intrudes on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

97. Defendant's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

98. Plaintiff and Class Members were harmed by Defendant's wrongful conduct as Defendant's conduct has caused Plaintiff and the Class mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

99. Defendant's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality have caused Plaintiff and the Class to experience mental anguish, emotional distress, worry, fear, and other harms.

100. Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class Members of the economic value of their interactions with

*2026-00902-TT*

Defendant's Website, without providing proper consideration for Plaintiff's and Class Members' property.

101. Further, Defendant has improperly profited from its invasion of Plaintiff's and Class Members' privacy in its use of their data for its economic value.

102. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

103. Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendant's Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT III**
**Breach of Contract**

104. Plaintiff re-alleges and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

105. Defendant's representations to Plaintiff and Class Members regarding its use of cookies and tracking technology, including the representations in its cookie notice, constitute a contract. By withholding consent to allow non-technical cookies, Plaintiff and the Class Members indicated their acceptance of Defendant's express offer not to employ cookie and tracking technologies while they navigated Defendant's website. In consideration for Defendant's promise, Plaintiff and the Class Members continued to use Defendant's website and products, in reliance on the representations Defendant made.

106. Plaintiff and Class Members would not have used Defendant's Website, or would have paid less for Defendant's services, in the absence of the contract binding them and Defendant.

21

Defendant's promised safeguarding of Plaintiff's and Class Members' Website Communications was critical to realize the intent of the parties.

107.    As detailed above, Defendant breached its contracts with Plaintiff and Class Members by disclosing their information third parties in direct contravention of the cookie notice.

108.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and Class Members' favor and against Defendant as follows:

A.    Certifying the Class and appointing Plaintiff as the representative of the Class;

B.    Appointing Plaintiff's counsel as class counsel;

C.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

D.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.    Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages in an amount in excess of the arbitration limits, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.    Awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

H.    Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses; and

I.    Granting such other relief as the Court deems just and proper.

*2026-00902-TT*

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the Class, demand a trial by jury of any and all issues in this action so triable of right.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Nicholas A. Colella*
Nicholas A. Colella
(Pa. ID No. 332699)
**LYNCH CARPENTER LLP**
1133 Penn Ave., 5th Floor
Pittsburgh PA, 15222
P: 412.322.9243
NickC@lcllp.com

*Attorney for Plaintiff and the Proposed Class*

23

*2026-00902-TT*

Docusign Envelope ID: 1C6E279A-A619-4900-990B-6ABCA32E8CD5

**VERIFICATION**

I, Carmen Rudnick, am fully familiar with the facts set forth in this Complaint and hereby certify that the facts set forth in foregoing Complaint are true and correct to the best of my knowledge, or information and belief, and that this statement is made subject to penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Dated: 1/29/2026

DocuSigned by:

*Carmen Rudnick*
4EA4A0CC1761468...

Carmen Rudnick

1

*2026-00902-TT*

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System of Pennsylvania that require filing confidential information and documents differently than non-confidential information and documents.

/s/ Nicholas A. Colella
Nicholas A. Colella

24

*2026-00902-TT*